AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
5/13/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___MMC___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
5/13/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___VV___ DEPUTY

United States of America

v.

Gustavo Torres and Kiara Jaime-Flores,

Defendants

Case No. 2:25-MJ-02904-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 28, 2025 in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 372 | Conspiracy to Impede or Injure Officer |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Ryan Ribner*
*Complainant's signature*

Ryan Ribner, Supervisory Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 5/13/2025

*Judge's signature*

City and state: Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA: Matthew Tako (x0705)

**AFFIDAVIT**

I, Ryan Ribner, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Supervisory Special Agent ("SSA") with the Department of Homeland Security ("DHS") United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I currently supervise the Cyber Financial investigations group at the HSI Los Angeles office. I have been employed with HSI since 2009, and I have also been assigned to HSI Arizona, HSI Attache Montreal, Canada, and HSI Chicago, Illinois. Prior to my employment with HSI I was employed for approximately seven years as a full-time Illinois certified police officer for two police departments located in the Chicagoland area. In connection with my official duties I have personally conducted, managed, and participated in investigations which have resulted in the arrest, prosecution, and dismantlement of trans-national and domestic criminal organizations for various offenses to include identity theft, money laundering, human smuggling, narcotics trafficking and various frauds. I hold a certification as an anti-money laundering specialist ("CAMS") from the Association of Anti-Money Laundering Specialists ("ACAMS"), a graduate certificate in Law Enforcement Intelligence Operations from the Michigan State University, a Master of Arts degree from Webster University, and a Bachelor of Arts degree from the University of Michigan.

2.  During this investigation, I used a variety of investigative techniques and resources, including physical surveillance, interviews, retrieving video surveillance footage, and the review of various databases and records. I also learned of information during this investigation from other law enforcement agents and criminal research specialists. This affidavit does not include all the investigative information discovered in this case but the information necessary to establish probable cause.

## II. PURPOSE OF AFFIDAVIT

3.  This affidavit is made in support of a criminal complaint against, and arrest warrant for, Gustavo TORRES and Kiara Jaime-FLORES for a violation of 18 U.S.C. § 372 (conspiracy to impede or injure officer).

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## III. SUMMARY OF PROBABLE CAUSE

5.  On February 28, 2025, TORRES and FLORES were involved with a vehicular chase where they used their Honda Fit, bearing

California license plate 7TCA818 (the "Subject Vehicle") to block and impede DHS agents while in their respective U.S. Government ("USG") vehicles during the performance of their official duties.

6.   On May 5, 2025, I interviewed FLORES and TORRES.  Both admitted to owning the Subject Vehicle. I received verbal consent from FLORES allowing me to search her cell phone. I discovered photographs of a USG Vehicle and social media posts about the pair trying to "stop" immigration agents. FLORES told me, after waiving her Miranda rights, that TORRES drove the vehicle that day. Later, TORRES admitted to chasing and blocking the USG Vehicles. Both admitted to acting to stop or impede immigration operations.

## IV. STATEMENT OF PROBABLE CAUSE

7.   Based on my interviews with law enforcement agents that were involved in the incident, my own knowledge of the investigation, and my training and experience, I am aware of the following:

**A.   TORRES and FLORES Interfere with a February 2025 HSI Operation**

8.   On February 28, 2025, HSI and Border Patrol agents conducted four search warrants at separate residences in Los Angeles, within the Central District of California. One of the warrants took place at 227 E. 61st Street, Los Angeles, California ("Target Residence"). Agents on the scene related that there was a small crowd that began to concentrate outside of the residence. SA Heffernan reported that one person in the

crowd started yelling, "You're here stealing kids… You're here taking kids". SA Halligan reported that some bystanders in the crowd were making comments to agents and that the "temperature rose pretty quickly."

9. At approximately 9:32 a.m., three USG law enforcement vehicles ("USG 1", "USG 2", and "USG 3," and, collectively, the "USG Vehicles") departed the Target Residence, following each other closely to transport evidence back to the HSI office. SA DeGuzman was a passenger in USG 3 and utilized his government cell phone to video record a few people outside of the Target Residence. I reviewed the video and identified that FLORES was standing in front of the Subject Vehicle, which was parked in front of the Target Residence. The USG Vehicles all departed westbound on 61st Street and stopped at a traffic light at 61st Street and Broadway.

10. SA DeGuzman stated that he observed a vehicle (later determined to be the Subject Vehicle) drive in the opposing lane and block USG 1 at the intersection of 61st Street and Broadway. Border Patrol Agent ("BPA") Carlos was a passenger in USG 1 and confirmed that the Subject Vehicle pulled in front of USG 1, blocking its pathway at the intersection. BPA Carlos utilized his government cell phone to record a video, which I reviewed and saw that the Subject Vehicle blocked the intersection.

11. On or about March 3, 2025, at approximately 6:45 p.m., I reviewed the surveillance camera footage from "R&F" which is a business establishment located at the intersection of 61st Street and Broadway in Los Angeles, where BPA Carlos filmed the

Subject Vehicle blocking the intersection. The surveillance camera is located on the south side of the building facing eastbound recording a portion of the oncoming westbound 61st Street traffic. The video showed a date and time stamp of "February 28, 2025, at 9:33." The video showed USG 2 and USG 3 stationery on 61st Street, waiting at the stoplight, and facing west. The video also showed the Subject Vehicle travelling westbound on 61st Street in an opposing lane, passing USG 2 and 3. The driver of USG 1 advised me that he was ultimately able to maneuver around the Subject Vehicle at 61st Street and travel southbound on Broadway.

12. While on Broadway, the occupants of USG 2 stated that the Subject Vehicle pulled in front of their car and then applied its brakes. The Subject Vehicle was driving aggressively and "brake checking," which the occupants believed was an attempt to cause a collision. I was also told that the Subject Vehicle (which the SA described as a dark colored or blue Honda) was angled at the USG vehicle's bumper area. An occupant of USG 3 similarly told me that the Subject Vehicle (described as a gray/silver Honda) turned in front of USG 2 in a "2 o'clock" position attempting to block USG 2.

13. Multiple USG Vehicle occupants told me that the Subject Vehicle ultimately pulled into a gas station parking lot on Gage Avenue near the 110 Freeway. An occupant of USG 3 stated that the Subject Vehicle drove through the gas station parking lot, pulled behind USG 3, and followed USG 3 for approximately 2 miles. The Subject Vehicle continued to drive

aggressively, attempting to cross multiple lanes as it followed the USG Vehicles.

    14.  On March 7, 2025, I retrieved video surveillance footage from "AS," which is a business establishment located at Gage and Grand Avenues in Los Angeles. The business had several surveillance cameras located on their building positioned to overlook different areas of their parking lot, gas pumps, Gage and Grand Avenues. I identified that the business surveillance footage had a date and time stamp of "2-28-2025, 09:44." The footage showed the Subject Vehicle entered the company's parking lot from Gage Avenue and then exited on Grand Avenue, then re-entered the parking lot from the north Grand Avenue entrance. The Subject Vehicle weaved around vehicles in the parking lot and positioned itself to face the westbound Gage Avenue traffic. On the footage, the Subject Vehicle had two occupants, with the driver having dark hair and a dark beard (later identified as TORRES). The footage also showed that the USG Vehicles were stationary at the traffic signal facing westbound on Gage Avenue at Grand Avenue. As the three USG Vehicles continued westbound under the 110 Freeway overpass, the Subject Vehicle pulled westbound on Gage Avenue following the USG vehicles.

    15.  On the video footage, I could not make out the Subject Vehicle's exact license plate, but could narrow it down to a few potential combinations, including California license plate "7TCA818." Also on March 7, 2025, I reviewed a record from the National Crime Information Center ("NCIC"), National Law Enforcement Telecommunications System ("NLETS") check for the

California license plate number 7TCA818. Based on that check, the license plate was registered to a 2016 Honda, with a vehicle identification number ("VIN") of JHMGK5H72GX037137, and owners listed as K.P. and C.H. of 423 ½ E. 61st Street, 2, Los Angeles, California 90003. A subsequent VIN check showed that the VIN is associated with a Honda Fit.

16. At approximately 3:16 p.m. on March 7, 2025, I checked 423 ½ E. 61st Street for the Subject Vehicle. I observed that a gray colored Honda Fit, bearing California license plate 7TCA818, was parked in the driveway of the residence. The vehicle matched the Subject Vehicle from the surveillance footage I reviewed as well as from the cell phone videos taken by occupants of the USG Vehicles.

    **B.    FLORES Admits to Using the Subject Vehicle to Impede the USG Vehicles**

17. On May 5, 2025, at approximately 8:18 a.m., I, along with other law enforcement officers, conducted a vehicle traffic stop of FLORES at Junction Street near 60th Street in Los Angeles while she operated the Subject Vehicle. During that stop, another officer learned that FLORES had a suspended California driver's license.

18. During the stop, I identified myself to FLORES and began an interview with her regarding the ownership of the Subject Vehicle. FLORES admitted to owning the Subject Vehicle; she stated that she never updated the registration and that K.P. and C.H. were the prior owners of the Subject Vehicle.

19. I explained to FLORES that the Subject Vehicle was involved in a February 28, 2025, criminal incident. FLORES asked if the incident was related to "immigration." I confirmed that it was immigration related and asked FLORES who was operating the Subject Vehicle on that date and also asked whether FLORES had a boyfriend or husband. FLORES said that she had a boyfriend named "Gustavo Torres" and that he operates her vehicle as well.

20. Regarding the incident, FLORES said that she received a call from her aunt that "immigration" was in her neighborhood. FLORES told me that she also observed a social media post that "immigration" was on her street. As a result, FLORES and her boyfriend TORRES went to the Target Residence. FLORES made a comment to me that it "wasn't right" what ICE was doing.

21. Later, during a consent search of FLORES's phone, I identified a deleted social media picture of the front of the Target Residence. The picture showed a date and time stamp of "March 3 1:43 p.m." and had writing on it that stated, "South Central Los Angeles Ice on 62th street Careful! Immigracion en la calle 62 Feb 28, 2025 Con Cuidado." Although the social media post stated, "62th street," I identified the black numbers on the house that read, "227" – the address of the Target Residence on 61st Street. I also identified a white pickup truck parked in the Target Residence's driveway, which appeared to be USG 2, as well as what I believe to be a federal law enforcement officer with tactical gear and body armor.

22. FLORES then began checking her phone for the date in question. I received verbal permission to look at her phone as

well. FLORES retrieved a picture of a USG 3, bearing a California license plate ending in -287. I recalled that USG 3 was a Chevrolet Tahoe and, based on the photo, I recognized that it was a photo of USG 3. One of the agents from the February 28 operation later confirmed it was USG 3.

23.   During a later search, I discovered another photo on FLORES's phone that appeared to be a social media post. The photo was taken on a freeway with vehicles in the distance. The photo had a date and time stamp of "February 28 10:18 a.m." and had writing that stated, "We Try to Stop But I Can't Do It Alone! We Need to Stick Together To Stop Them For as Long As We Can! Please Let's Fight Together In A Good Way! Somos Mas Gente Que Officiales migra!"

24.   I then placed FLORES in the rear of the Inglewood Police vehicle and read FLORES her Miranda rights. FLORES said that she understood them and waived her rights and agreed to speak to me.

25.   FLORES admitted to being involved in the incident and stated that she was the passenger inside of the Subject Vehicle that was driven by her boyfriend, TORRES. FLORES said that they were being "activists." I showed FLORES the video one of the agents took of the Subject Vehicle blocking the USG Vehicles and FLORES identified this as TORRES and herself.

    **C.**    **TORRES Similarly Admits to Using the Subject Vehicle to Impede the USG Vehicles**

26.   I then telephonically spoke to TORRES in the presence of FLORES. FLORES told TORRES to meet with HSI agents and

stated, "we did nothing wrong." TORRES informed me that he has a suspended driver's license and that it was suspended the day of the incident. TORRES agreed to meet me at a business establishment named "AB" located at 9135 Norwalk Boulevard, Santa Fe Springs, California.

27. At approximately 9:43 a.m., I met with TORRES at the business establishment named AB in the City of Santa Fe Springs, California. I told TORRES that he was not under arrest and initiated a recorded interview with TORRES.

28. TORRES admitted to operating the Subject Vehicle on February 28, 2025. TORRES also admitted to using the Subject Vehicle to block the roadway purposely, which limited the egress of DHS agents. TORRES stated that he used the Subject Vehicle to chase DHS agents for several blocks.

29. Specifically, TORRES stated that he and FLORES responded to the Target Residence based on a social media post that FLORES saw. TORRES said that while on the scene he observed, "Suburbans inside the property" and that it was supposedly "immigration." TORRES stated that he saw bystanders near the Target Residence. TORRES further said that he is "Mexican.. and has pride for Mexico." TORRES went on to state, "…so we we thought that it'd be a good idea, ya' know maybe if, maybe if it was immigration they were taking someone's family member unjustified… So, well me and my girlfriend the first instinct was well to block the cars."

30. TORRES said that, while he was outside of the Target Residence, he saw someone walk outside and say, "they took

someone." TORRES told me that he replied, "Well do something about it." TORRES said that the person didn't "do nothing" so he and FLORES decided they were going to see where immigration was "taking them."

31. TORRES confirmed that the first place that he blocked the USG Vehicles was at "Broadway and 61st." TORRES said that when the agents tried to travel around his vehicle, he "reversed and blocked him again." Regarding the agents' course of travel, TORRES stated, "They made a left on Broadway, they they made a right on Gage, I, I followed them basically."  Later, TORRES also admitted to pulling in front of the USG Vehicles and applying the brakes. TORRES stated, "I don't know. Numbers, numbers, I don't know but I know I did do that."

32. I told TORRES that he stalked the USG vehicles when he pulled into the gas station. TORRES stated, "When we took off, when we took off. I know, it was so stupid, and I would never do that in my life, I don't know what I was thinking. Uh (sigh), I don't know. I would never do it again."

33. I also showed TORRES several still photos from the AS business surveillance footage. TORRES admitted that the photo was of him and the Subject Vehicle. TORRES advised that he didn't know anyone at the Target Residence. Also, TORRES stated, "... We thought we were helping the community or something by trying to stop you guys but."

//
//
//

## V. CONCLUSION

34. For all the reasons described above, there is probable cause to believe that TORRES and FLORES violated 18 U.S.C. § 372 (conspiracy to impede or injure officer).

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 13th day of May, 2025.

_____
HON. MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE